U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

2020 APR 22  PM 3: 43

CLERK

BY _EH_____
DEPUTY CLERK

SHAT ACRES HIGHLAND     )
CATTLE, LLC, JANET      )
STEWARD and RAY         )
SHATNEY,                )
        Plaintiffs,          )     Docket No.  2:20 -cv-62
                       )
v.                      )
                       )
AMERICAN HIGHLAND       )
CATTLE ASSOCIATION,     )
        Defendant.           )

## COMPLAINT

### Jurisdiction and Venue

1.  Plaintiff Shat Acres Highland Cattle, LLC is a Vermont limited liability

    company with its principal place of business in Plainfield, Vermont.

    Plaintiff Shat Acres Highland Cattle, LLC has two members.  The

    members are both citizens of Vermont.

2.  Plaintiff Janet Steward is a resident of Plainfield, Vermont.  She is a

    member of Plaintiff Shat Acres Highland Cattle, LLC.

3.  Plaintiff Ray Shatney is a resident of Plainfield, Vermont.  He is a

    member of Plaintiff Shat Acres Highland Cattle, LLC.

4.  Defendant American Highland Cattle Association is a South Dakota not-

    for-profit corporation with its principal place of business in Brighton,

    Colorado.

5. Defendant American Highland Cattle Association has several members in Vermont and transacts business in Vermont with relation to its members.

6. Plaintiffs are members of Defendant American Highland Cattle Association.

7. Jurisdiction and venue are proper in this Court pursuant to 28 U.S.C. §1331 and 15 U.S.C. § 22.

<u>Factual Allegations</u>

<u>Background</u>

8. Plaintiff Shat Acres Highland Cattle, LLC ("Shat Acres") is a small, family owned farm in Plainfield and Greensboro Bend, Vermont which is in the business of breeding and selling Highland cattle and beef.

9. Defendant American Highland Cattle Association ("AHCA") is a trade association founded in 1948 which regulates the breeding and showing of Highland cattle in the United States with the stated purpose of preserving the integrity of the breed and assisting members in creating and maintaining the value of their Highland cattle stock.

10. Highland cattle are a breed of beef cattle which originated in Scotland and were imported to the United States in the early 20th century.

11. Plaintiffs Janet Steward ("Steward") and Ray Shatney ("Shatney") are a married couple who currently, and at all times relevant to this Complaint, own and operate the Shat Acres Highland farm.

12. In addition to selling beef, Plaintiffs breed cattle and exhibit them at Fairs and AHCA point shows nationwide and sell cattle and cattle semen for breeding purposes throughout the United States, Canada and the world.

13. Plaintiffs own and maintain the oldest registered herd of Highland cattle in the United States, their first Highland cow being purchased in 1967.

14. Additionally, Shat Acres Highland Cattle is the oldest closed Highland herd in the United States. Plaintiffs have not purchased a non-Shat Acres female in over 40 years which results in every animal being a product of their own genetics and breeding.

15. Shat Acres Highland Cattle has been a dues paying member of AHCA since 1967 and have been registered on Defendant AHCA's cattle registry for over fifty years.

16. Carroll and Leona Shatney, Plaintiff Shatney's parents, were inducted into the Highland Hall of Fame in 2003. As part of the induction process, Defendant AHCA stated that "the Shat Acres name has long been a symbol of quality recognized all over the Northeast. We appreciate the many years you have produced cattle that have such a positive impact on the breed."

17. Shat Acres Highland Cattle has registered over 470 head of Highland cattle with Defendant AHCA, which is more cattle than almost any other AHCA breeder.

18. Since 1967, Shat Acres Highland Cattle have been shared with the public at over 500 venues, including Fairs, AHCA Point shows, hospitals, schools and juvenile detention centers. Shat Acres Highland Cattle have been presented to several hundred thousand spectators at shows and Fairs.

19. Plaintiff Shatney has been showing Highland cattle for over fifty years and shows the Shat Acres cattle in every class entered.

20. Plaintiffs Steward and Shatney have no employees, and are responsible for all aspects of operation and maintenance of their 150 cattle herd.

21. Plaintiffs' Shat Acres Cinnamon Raisin is the most highly decorated Highland cow in the United States, garnering over a dozen Grand Championships, several Supreme Champions of show and multiple Grand Champion Produce of Dam awards.

22. Shat Acres Highland Cattle has won five National Western Grand Championships, two Reserve Grand Championships and two Roll of Excellence Female awards.

23. Shat Acres, and its associated business Greenfield Highland Beef, were named the 2016 Small Business Association Vermont Family Owned Business of the Year.

24. Shat Acres has been specifically recognized by all three members of Vermont's United States Congressional delegation for their service to Vermont consumers and their contribution to the Vermont economy.

25. Shat Acres was recognized by Vermont's Secretary of Agriculture as "putting Vermont on the map by raising the best Highlands in the United States."

26. Shat Acres Highland Cattle pastures are used as intensive grazing demonstration plots by the Vermont Agency of Agriculture.

27. Plaintiffs have received multiple commendation and appreciation letters from Defendant AHCA's employees, Board of Directors, Regional Associations, and AHCA members for their service to the organization.

28. Plaintiffs have regularly contributed items for AHCA auctions for the Association, its Junior Members and the Highland Cattle Association. Items contributed to these auctions have raised thousands of dollars for Defendant AHCA.

29. Shat Acres Highland Cattle have been sold all over the United States and the world, including Australia.

30. Shat Acres Highland Cattle regularly hosts visitors to their Highland farm from throughout the United States and the world, most recently a contingent of forty farmers from Belgium.

31. Shat Acres Highland Cattle has been regularly chronicled by print and television news media for their awards and multiple Grand Championships at AHCA shows and their history and contributions to Vermont agriculture.

32. Shat Acres Highland Cattle has more media postings on the AHCA website's "Members in the Media" section than any other AHCA breeder.

33. Shat Acres Highland Cattle donates regularly their beef to the Vermont Food Bank, Senior Citizen Centers, Meals on Wheels, Glean, Town Meeting meals, Fire Department and Rescue Squad events, School fundraising dinners and auctions.

34. Shat Acres Highland Cattle beef has also been delivered to the White House and been prepared and served by professional chefs at large public events for hundreds of attendees.

35. Plaintiff's Highland beef recipes have been published in multiple cookbooks and Plaintiff was featured in a nationally televised cooking show, preparing and serving Highland beef.

36. Plaintiffs are also very active locally and in the region.  Shat Acres Highland Cattle, for over fifty years, has provided a Cow and Calf to "McDonald's Farm" for ten days, at the Champlain Valley Exposition, the largest County Fair in Vermont.

37. Plaintiffs are dues paying members of several state and regional farming and beef marketing associations.

38. Prior to working full time on the farm, Plaintiff Steward was a full-time educator for thirty years, recognized as the Vermont Teacher of the Year in 2002 and an American Star of Teaching in 2004.

39. Prior to working full time on the farm, Plaintiff Shatney operated a Tree Service business for twenty-three years, removing danger trees, clearing power lines and repairing storm outages.

40. Plaintiffs have also volunteered their time serving in local organizations, such as Plaintiff Shatney's 40 years of service on Greensboro Volunteer Fire Department and Plaintiff Steward's service as Chair of the Town of Plainfield Selectboard and on Vermont regulatory bodies related to the field of education.

41. In return for paying membership dues and other fees to AHCA, the Association covenants with its members to represent their interests with respect to maintaining the value of the Highland breed.

42. AHCA further covenants with its members to treat all members equally and without favoring the interests of certain members over others.

43. All AHCA officers and members of AHCA committees are members or employees of the Association.

44. All actions taken by AHCA with respect to membership, cattle registry, discipline or other actions are taken by agreement by and between, as well as through, its members, officers and committee members.

45. Plaintiffs are long-standing members of AHCA and have served AHCA in numerous roles over the years, including as a member of the Board of Directors and as both the Chair and members of multiple committees. Plaintiffs have also been members of the AHCA Beef Marketing Panels,

the National Western Stock Show Meeting Master of Ceremony, an AHCA Convention speaker, Regional Contributor to the official AHCA quarterly publication (the "Bagpipe"), and have authored numerous articles published in the Bagpipe.

Operation of Highland Cattle Industry:
AHCA Registry, Point Shows and Plaintiffs' Success

46. Defendant AHCA also maintains and operates the principal national American breed registry for Highland cattle.

47. The breed registry is a list of American Highland cattle in the United States and Defendant AHCA performs the function of certifying the pedigree and purebred/crossbred status of all cattle listed on the registry.

48. In order for cattle to be listed on the registry, the owner(s) of the cattle must be a current, dues-paying member of AHCA.  A cattle owner cannot register an animal on the AHCA Highland registry if the owner is not a current member of AHCA.

49. In addition, an animal cannot be registered on the AHCA registry unless its pedigree is established by having its sire and dam also registered with AHCA or, if the sire or dam is foreign, an applicable foreign registry.

50. An animal which is unregistered on the AHCA registry has significantly less breeding and resale value than a registered animal.

51. Defendant AHCA also organizes and sponsors livestock shows, referred to as "point shows," where Highland cattle are shown to judges and compete against other AHCA registered Highland cattle for awards.

52. During the point shows, the animals are judged according to the standards applicable to the shows and the shows are conducted in accordance with the Rules set forth by the International Association of Fairs and Exhibitions ("IAFE").

53. IAFE Rules have long been in place and have governed AHCA shows for decades.

54. IAFE Rules were adopted at the National Western Stock Show approximately 30 years ago.  In order to show animals at a show where IAFE Rules are in place, the breeder is required to sign an agreement to abide by those rules on the AHCA entry form.

55. This agreement to abide by IAFE Rules is required for all AHCA sanctioned shows and is evident on all AHCA sanctioned show applications.

56. The requirement that exhibitors at shows follow IAFE Rules is disseminated to AHCA membership by other avenues as well.

57. The Spring 2010 Bagpipe includes "AHCA Rules for ROE Sanctioned Shows" and states that "Exhibitors agree to abide by the IAFE (International Association of Fairs and Expositions) National Code of Show Ring Ethics."

58. In the Spring 2017 Bagpipe, the Show Committee Update included an article entitled "The IAFE Code of Show Ring Ethics Background and

Explanation", followed by a printing of the entire IAFE Code of Show Ring Ethics.

59. Notwithstanding this publication, Defendant AHCA printed in the Summer 2019 Bagpipe the false claim that "[t]he AHCA Board has recently adopted the International Association of Fairs and Expositions Code of Show Ring Ethics" in an attempt to provide cover for fraudulently claims of ethical violations made against Plaintiffs as discussed *infra*.

60. Individual animals earn points at the point shows in different categories and toward overall rank based upon their placing at said shows. The points earned are accrued toward the Roll of Excellence.

61. In order to participate and accrue points in an AHCA point show, an animal must be registered on the AHCA registry.

62. Animals that win championship awards at point shows and place high on the Role of Excellence have significantly higher breeding and resale value than animals that do not earn such awards and placements.

63. Although Shat Acres Highland Cattle had been exhibited and won prizes at local Fairs since 1967, Plaintiffs did not begin taking their animals to National Shows until 2001 and began having immediate success.

64. The National Western Stock Show is the biggest Highland show in the United States with, at times, over two hundred Highlands entered annually and thirty to forty Highland breeders represented.

65. In 2004 Plaintiffs attended the NWSS in Denver, Colorado. In 2004 Plaintiff's Shat Acres Cinnamon Swirl was named Grand Champion Female at the National Western Stock Show.

66. Over the time period 2004-2017, despite a hiatus from showing caused by Defendant's attempts in 2015 at targeting and harassment, Plaintiffs won well over 60 individual category or show championship awards with 22 different animals.

67. Over that same time period, Plaintiffs also won numerous overall herd, breeder and exhibitor awards.

68. In 2017, following the interruption caused by Defendant's attempts in 2015 at harassment and anticompetitive conduct described *infra*, Plaintiffs felt safe to show their animals after their complete exoneration by the AHCA Board of Directors and resumed showing their cattle at AHCA point shows.

69. In 2017, which was the last year Plaintiffs felt safe to show their Highland cattle due to Defendant's 2018 conduct described *infra*, Plaintiffs attended five AHCA point shows.

70. Plaintiffs' Shat Acres cattle won Grand Champion at every one of the five shows they attended in 2017, with eight different animals.  Plaintiffs were also awarded the Premier Breeder and Premier Exhibitor awards.

71. At the one show in 2017 that offered a Highland Supreme Champion of Show, Shat Acres won that award also.

72. As noted *supra*, Shat Acres Cinnamon Raisin is the most highly decorated Highland cow ever in the United States, garnering over a dozen Grand Championships and several Supreme Championships.

73. Plaintiffs have won dozens of Grand Championships, including many at the NWSS.

74. Plaintiffs' cattle have also won multiple Roll of Excellence awards.

<u>Preparation of Highland Cattle for Show</u>

75. Plaintiffs are proponents of showing Highland cattle in the traditional manner in which Highland cattle have been presented throughout the world for over two centuries.

76. Highland Cattle have been shown to the public at competitions throughout the world since at least the 1800's. Judging has been based on published Breed Standards, which many countries' Associations have in place for Highland Cattle.

77. Breed Standards focus on characteristics of the Highland breed such as frame size, strong feet and legs, level topline, but most of all the unique traits of the breed: their long horns and long hair of "great profusion."

78. Throughout most of the world, and, until recently, in the United States as well, Highland cattle are shown in their natural coat, with preparation for the show ring being very minimal--bathing the animals and perhaps removing a few errant belly hairs being the extent of the grooming process.

79. The American Highland Cattle Association has never developed its own Breed Standard, and for years relied on those previously published by the Highland Cattle Society of Scotland, where the breed originated, which were based upon showing the animals in their natural coat.

80. Since AHCA breeders began participating at AHCA point shows, and until very recently, Highland cattle have been shown in their natural coats with minimal trimming of their long hair.

81. Heavy coats and copious hair cover has been an admired and desired trait by AHCA breeders for decades for which the animals were bred as a sign of healthy cattle and in recognition of Highland breed standards.

82. AHCA point shows were a place of comradery, where breeders assisted each other with their cattle and enjoyed spending time with breeders from near and far.

83. In 2008, an AHCA member hired a professional groomer well-known by judges throughout the United States for her expertise and skill in preparing commercial beef breeds for the show ring.

84. The groomer, Pearl Walthall, and her husband Greg, were engaged to alter the member's animals to make them appear more like other commercial beef cattle. The practice is known as "shaving", "clipping" and/or "blocking."

85. Due to the relative scarcity of Highland cattle in comparison to other cattle breeds in the United States, judges at Highland shows in the

13

United States who are unfamiliar with the unique traits of the Highland breed often placed cattle who were clipped, blocked and shaved to look like more commercial breeds over those who exhibited excellence in Highland breed standards.

86. As a result of this misjudging by commercial cattle judges, Walthall's employer became very successful in showing his cattle.

87. Some Highland breeders began emulating this manner of showing cattle by clipping and shaving their animals.

88. Most Highland breeders, including Plaintiffs, still felt it important to preserve the unique traits of the Highlands by not clipping and shaving the animals while recognizing that it was the shaved and clipped animals that the judges were generally selecting as their Champions.  Despite this tendency, Shat Acres continued to be competitive in the show ring.

89. In 2009, then AHCA President Jacquelyn Chotkowski could see the harm to the breed being caused by this alteration of the Highlands entering the show ring, and to Defendant AHCA by the discord it was causing among AHCA members.

90. The Winter 2009 Bagpipe contained a report of the AHCA Show Committee which states that every judge at an AHCA show will be sent information regarding the breed and indicated "unanimous agreement that blocking is to be discouraged as it drastically changes the unique appearance of the Highland breed."

91. In 2009, consistent with President Chotkowski's directive, Defendant AHCA developed its first Long Range Plan ("LRP"). In the Show Section of the LRP the first bullet states "Cattle will be shown in the natural (i.e. unclipped) coat condition (reinforces role as a production breed)."

92. At the same time, Defendant AHCA also developed a "Policy Statement Concerning the Fitting of Highland Breeding Cattle for the Show Ring". The policy states, in relevant part: "Attempting to alter the physical appearance of Highland cattle breeding show stock by excessive removal of hair is not an acceptable procedure at any ROE recognized Highland cattle show...excessive clipping of blocking will not be tolerating in the show ring except for market animals...."

93. Chotkowski further elaborated in the Winter 2010 Bagpipe, in her President's message, that AHCA members should "[r]ise up to the challenge and bring your cattle to Denver without having clipped them up..."

94. After AHCA's swift response to his blocking and shaving his cattle, Walthall's employer stopped showing Highland cattle at AHCA point shows.

95. For several years after Chotkowski's 2010 directive, there was relative calm in the American Highland Cattle Association.

96. Almost all cattle were again being shown in their natural coats, with comradery among AHCA members.

97. Plaintiffs have always believed Highlands should be shown as they have for centuries, with their long horns and long hair.

98. Plaintiffs have never clipped, shaved or blocked their Highland breeding stock.

Influential AHCA Members and the Evolution of Preparation Style

99. Jacquelyn Chotkowski has been a member of Defendant AHCA for over 20 years and operates Spring Flight Farm in Elmira, New York.

100.    Chotkowski has been an active member of AHCA for many years.  She has served for many terms on the Board of Directors and as President of the Association.  She has also been, and continues to be, a long term member of the AHCA Executive and Governance Committee.

101.    For several years, she was the associate editor, and she is now the editor and publisher, of the Bagpipe, Defendant AHCA's official newsletter and member magazine.  As editor and publisher, Chotkowski exercises complete control over the contents of the Bagpipe.

102.    It is widely believed among AHCA members that, despite who may be serving as an officer or Board member, Chotkowski, and those allied with her, control the Association and all aspects of it.

103.    AHCA members refer to Chotkowski as AHCA's "New York office" and commonly comment that Association actions must meet the approval of the "New York office" before being sanctioned by Defendant AHCA's Board.

104.   Despite her decades of membership in the Association and history of showing her cattle, Chotkowski's Spring Flight Farm has never won a NWSS Grand Championship or achieved comparable success to Plaintiffs at AHCA point shows.

105.   In or about 2016, Star Lake Cattle Company of Sunapee, New Hampshire, hired Pearl Walthall, a nationally known fitter and show-person for multiple beef breeds and the same person previously hired by a different member in 2008.

106.   Walthall is known and recognized by most United States beef judges for her skill at fitting, enhancing and altering the appearance of a beef animal to make it more attractive to ring judges.

107.   As in the past, animals prepared by Walthall looked more like the commercial beef cattle judges were accustomed to seeing and began winning championships at AHCA shows.

108.   Although previously achieving sporadic and marginal success, with their cattle prepared by Walthall in 2016, Star Lake began having consistent success, winning Grand Championships at the NWSS and at AHCA shows.

109.   Notably, Star Lake's success in 2016 came during an extended absence from the show ring by Plaintiffs as, due to Defendant AHCA's conduct in 2015, Plaintiffs refrained from showing cattle in 2016 at AHCA point shows.

110.   Other Highland breeders took notice of Star Lake's success and began emulating the show preparation techniques of Walthall.

111.   The same discord and conflicting views of 2009 returned to AHCA.

112.   In 2016, Chotkowski became part owner of a Highland bull owned by Star Lake Cattle Company, of Sunapee, New Hampshire.

113.   Walthall and her crew of expert fitters prepared the bull co-owned by Chotkowski and Star Lake for the show ring.

114.   At the 2016 KILE show in Harrisburg, Pennsylvania, where her co-owned Star Lake bull had been prepared for the show ring by up to six groomers on one animal, including Walthall, Chotkowski was involved in a loud, verbal disagreement with multiple other breeders who were concerned about the excessive hair removal.

115.   Her actions were so offensive that she was reported in writing by several breeders to the Board of Directors and the Ethics Committee.

116.   The complaints were ignored by Defendant AHCA and justified its own inaction by claiming that it was not AHCA's role to govern such conduct.

117.   At that show, Walthall also assisted with the preparation of cattle owned by AHCA member, and then President, Laura McDowell-May and her family.

118.   At the 2017 NWSS, Star Lake's bull, co-owned by Chotkowski and prepared again by Walthall, garnered Reserve Grand Champion Bull.

119.    Following this success, Chotkowski's willingness to own, and show, an animal that is prepared in such a manner differed markedly from her previous stance regarding clipping and blocking as expressed in her previously published 2010 public statements when she was President of AHCA and Defendant's 2009 LRP.

120.    Because most breeders believe they cannot compete with these blocked and altered cattle, many AHCA members have either dropped their membership, stopped showing cattle or begun showing cattle which are now clipped and shaved for the show ring.

121.    Despite choosing not to alter the natural appearance of their cattle, Plaintiffs continued to garner Championship awards when they returned to the show ring in 2017.

Highland Beef Marketing Association and Beef Marketing Committee

122.    Shortly after Plaintiff Steward met Plaintiff Shatney, she asked him what his goal in life was. Shatney shared that he had promised his father that he would preserve the genetics of the oldest registered herd of Highland cattle in the United States as his father had requested.

123.    Plaintiff Steward realized that the Highland herd could not be sustainably supported without selling beef in addition to their champion breeding stock.

124.    In 2007, Plaintiffs began selling their Highland Beef commercially, under the trade name Greenfield Highland Beef.

19

125.   The 2009 AHCA Long Range Plan, adopted when Jacquelyn

Chotkowski was AHCA's President, lists the major objectives for the

future of the AHCA.

126.   One of the goals listed includes "Effective Highland beef promotional

programs sponsored by the Highland Beef Marketing Association with at

least 20 sponsoring beef producers with an annual budget of more than

$100,000.00."

127.   The 2009 Long Range Plan describes the formation of the Highland

Beef Marketing Association as "a new affiliated entity ... governed

independently of the Association" which will provide funding "on a 'pay to

play, basis".

128.   The Long Range Plan stated that the Board would facilitate the launch

of this new approach to Highland beef marketing development.

129.   The "Pay to Play" Highland Beef Marketing Association was formed.

130.   At the 2010 AHCA Annual Convention, a session focused on marketing

Highland beef was offered.

131.   Plaintiff Steward chose to attend that session to learn more about how

to successfully market Highland beef.

132.   There were approximately four Highland farms attending the

workshop.

133.   Then-AHCA President Jacquelyn Chotkowski and California Highland

breeder Ted Hall were presenters.

134. Attendees were asked if they had $5000.00-$10,000.00 to join the presenters' "Pay to Play" venture.

135. All of the attendees appeared confused by this request as the expectation had been for an educational presentation about how to become successful in marketing Highland beef.

136. None of the attendees volunteered to supply $5000.00-$10,000 to the presenters.

137. The attendees were told they were not welcome at the workshop if they did not intend to pay the fee to participate.

138. As the attendees left the workshop, all seemed confused by Chotkowski's insistence that they pay this large sum of money to learn about how to sell Highland beef.

139. No members ever joined the HBMA.

140. No monies were ever budgeted by AHCA for use by the HBMA.

141. When it became clear than neither ACHA nor its members supported the HBMA pay to play scheme, Chotkowski became more actively involved in the Quality Highland Beef ("QHB") program.

142. QHB was a separate AHCA "pay to play" marketing program that began in 1994.

143. Despite its longevity, the QHB program had met with minimal success, with most AHCA members seeing little benefit to membership in QHB.  In

2005, despite its existence for over twenty years, QHB had 68 members, less than 5% of AHCA's membership.

144.   Chotkowski became the Chair of the QHB Committee and initiated an intense promotional campaign to garner a broader share of AHCA's membership involved in this pay to play program.

145.   Dean Adams was sworn in as AHCA's President in June 2010, replacing Chotkowski, whose term limit had expired.

146.   In Denver, CO in January 2011, President Adams detailed a new Committee structure focusing on Education, Breed Promotion and Protection and Beef Marketing, to revitalize AHCA and encourage membership participation.

147.   In January 2011, Plaintiff Steward was appointed Chair of the newly convened Beef Marketing Committee (BMC) by then AHCA President Dean Adams, due to her successful efforts marketing Highland beef and her commitment to helping others achieve success as well.

148.   Plaintiff Steward created a survey that was sent out to all AHCA members, requesting information on what members most wanted from AHCA to assist them in marketing their Highland beef.

149.   The BMC then focused on developing and providing marketing materials at no charge to any dues paying AHCA member.

150.   The BMC also developed the option open to all members to have a "Steak Icon" next to a member's name on the membership list to denote that breeder was selling Highland Beef.

151.   In its first year of availability over seventy AHCA members chose to participate in the BMC's marketing initiative to display the "Steak Icon."

152.   Under Plaintiff Steward's leadership, the BMC has been very successful over the years in developing resources and partnerships in order to aid all AHCA members in marketing their Highland beef products.

153.   In 2015, eighty-nine AHCA members chose to participate with the BMC's marketing initiative.

154.   By contrast, in the same year, membership in QHB, the twenty-year-old "pay to play" program Chotkowski was promoting, declined to 47 members.

### 2015 False, Unfair and Fraudulent Anticompetitive Actions

155.   During her tenure as Chair of the BMC, Plaintiff Steward was asked to make regular reports regarding the BMC's progress to Defendant AHCA at Board meetings, Conventions and in the Bagpipe.

156.   At every Board meeting in which Plaintiff Steward made a BMC report, she was challenged and harassed by Jacquelyn Chotkowski, who stated that she would block any efforts of the BMC to make beef marketing materials available to all AHCA members.

157.   Each time Plaintiff Steward reported to the AHCA membership regarding the BMC Committee, Chotkowski would leave the room or turn her chair so that her back faced the presentation podium.

158.   Following a Board meeting in January 2015 in Denver, Colorado, Chotkowski waited for Plaintiff Steward in the hallway outside the meeting room and cornered her against a wall.  Chotkowski stated that she would do everything in her power to prevent the BMC from creating beef marketing materials for all AHCA members.

159.   On March 19, 2015, during a Breed Protection &Promotion (BP&P) Committee teleconference, Chotkowski repeatedly interrupted Plaintiff Steward while giving her Beef Marketing report.

160.   During these interruptions, Chotkowski repeatedly, and falsely, told the subcommittee that Plaintiff Steward was lying during her report. Chotkowski later admitted this conduct in an email to the Board.

161.   While the nine members present for the teleconference were aware of these verbal attacks, Plaintiff Steward reported the verbal attacks to no one else.

162.   At the time of the teleconference and Chotkowski's verbal assaults, Plaintiff Shatney was serving as a member of the AHCA Board of Directors and the Beef Marketing Committee.

163.   On March 29, 2015, AHCA's then President Deb Nelson telephoned Plaintiff Shatney and told him that the AHCA Executive Committee had

met and instructed her to issue an official verbal reprimand to Plaintiff Shatney for being a troublemaker.

164. Nelson also informed Plaintiff Shatney that he could no longer serve on any AHCA committees.

165. Nelson further informed Plaintiff Shatney that Plaintiff Steward was also being officially reprimanded under the direction of the Executive Committee for being a liar.

166. When informed of the call, on that same day, Plaintiff Steward emailed members of the AHCA Executive Committee to inquire as to the reasons for the reprimands and to request copies of the minutes wherein the Executive Committee approved the reprimands and directed Nelson's actions.

167. When no response to Plaintiff Steward's inquiries was received, Plaintiff Steward wrote to the AHCA Board of Directors for assistance in receiving the Executive Committee minutes and an explanation for the reprimand.  No minutes or explanation were sent.

168. Plaintiffs were subsequently informed by a member of the Executive Committee that the Executive Committee had neither met nor directed President Deb Nelson to issue an official reprimand to Plaintiffs.

169. Plaintiffs were later informed that Chotkowski and another AHCA member had instructed President Nelson in a telephone conversation to issue Plaintiffs an official reprimand.

170.  At a subsequent Board of Directors teleconference meeting, on April 7, 2015, Chotkowski again insulted Plaintiff Steward, and Vice-President McDowell May, an attorney, threatened to bring unspecified criminal charges against Plaintiffs.

171.  When Plaintiff Steward inquired as to why she was being threatened, Chotkowski shouted that Steward was "a pain in her [expletive deleted]" and President Nelson responded that Plaintiffs were being sanctioned for requesting minutes and making repeated inquiries regarding the reprimands.

172.  Additionally, Nelson, Vice-President Laura McDowell-May and Treasurer John Ligo responded to Plaintiffs' inquiry by denying President Nelson's unauthorized actions and chastised Plaintiffs for misrepresenting events.

173.  Due to the turmoil caused by the situation, the Board of Directors, in accordance with AHCA's Rules and Regulations, accepted a motion authorizing the Ethics Committee to investigate the Executive Committee, Jacquelyn Chotkowski, Ray Shatney and Janet Steward.

174.  In response to the false accusations and threats of legal action being brought against them, Plaintiffs retained an attorney to represent their interests.

175.  AHCA member John McLaughlin, an attorney who provided legal advice to the Board of Directors, informed Plaintiffs' attorney that

Plaintiffs' actions were injurious to AHCA and demanded that Plaintiffs issue a written apology to the Association and that Plaintiff Steward "kiss and make up" with Chotkowski.

176.   Despite the obvious conflict, Executive Committee member John Ligo then attempted to manipulate the composition of the Ethics Committee investigating the possible ethical violations of himself as member of the Executive Committee, as well as of Plaintiffs.

177.   On May 1, 2015 Nick Self, Chair of the Ethics Committee, emailed the AHCA Board seeking approval for the Ethics Committee to consist of Nick Self, Dean Adams, Sharon Green and John McLaughlin.

178.   On May 3, 2015, the Board approved the proposed Ethics Committee membership.

179.   After receiving no invitation to be interviewed by the Ethics Committee, Plaintiffs wrote to the Ethics Committee requesting to speak with them to assist with their investigation but received no response.

180.   On June 14, 2015, a report of the Ethics Committee was provided in the Board preparation packet for the September 15, 2015 Board meeting. The report stated that the Ethics Committee met on 5/4/15 and 5/18/15, and that it had gathered information and completed interviews of all involved members being investigated.

181.   At that time, neither Plaintiffs Shatney nor Steward had been interviewed.

182.   Plaintiffs then informed the Board that the Ethics Committee had not interviewed them.

183.   In response, the Ethics Committee informed the Board that it would extend its information gathering and then notified Plaintiffs of their interview less than three days prior to the interview.

184.   In anticipation of the interview, Plaintiffs requested minutes of the Ethics Committee meetings but were informed that no such minutes exist.

185.   Plaintiffs were subsequently interviewed by teleconference by the Ethics Committee comprised of Nick Self, Chair, Dean Adams and Sharon Green.

186.   On September 15, 2015, the findings of the Ethics Committee were read aloud during the Board meeting.   Plaintiffs were completely exonerated by the Committee's report of any wrongdoing.

187.   The Board voted unanimously to accept the report and findings of the Ethics Committee.   Chotkowski was cited, however, for inappropriate communication and ordered to issue a written apology to Plaintiff Steward and the BP&P Chair within 30 days.

188.   On the thirtieth day following the Board's directive, Plaintiff Steward received an email from Chotkowski's email address with no greeting or signature, in which Chotkowski admitted to her conduct but stated that it was necessary to "interrupt the beef marketing report because of inaccuracies." No apology, contrition or remorse were stated.

189.   Plaintiff Steward's March 19, 2015 report contained no inaccuracies, no inaccuracies have been suggested by any investigation, and the Beef Marketing report had been approved by all members present, including Chotkowski.

190.   Plaintiff Steward notified the Board of Chotkowski's non-compliance with their directive to issue an apology.

191.   Plaintiff received no response to her notification to the Board. The Board also did not require that Chotkowski provide any further comment or the apology the Board had previously ordered.

192.   In 2015, while Plaintiffs were under investigation by Defendant AHCA for alleged Ethics violations, Plaintiffs suffered severe emotional harm due to the targeting and harassment by AHCA, its officers and Chotkowski.

193.   In 2015, while Plaintiffs were under investigation by Defendant AHCA for alleged Ethics violations, Plaintiffs suffered further humiliation at AHCA shows as Chotkowski and Executive Committee members publicly mocked and ridiculed Plaintiffs.

194.   In 2015, as a result of the ostracizing of Plaintiffs by members due to the targeting and harassment by AHCA, Plaintiff Shatney felt he had failed his promise to his parents to protect and preserve the most ancient Highland genetics in the United States.

195.   As a result of the harassment, targeting and threat of criminal action to be brought against them by AHCA through its officers in 2015, Plaintiffs incurred expenses to hire an attorney to represent them in the AHCA's frivolous and capricious Ethics investigation.

196.   As a result of the harassment and targeting by the AHCA and member Chotkowski, Plaintiffs made the difficult financial and emotional decision to refrain from attendance at most AHCA point shows during 2015.

197.   Despite the Ethics Committee's findings, Chotkowski and her allies continued to harass Plaintiffs and the Beef Marketing Committee Steward Chaired in an effort to cause its failure.

198.   McDowell-May, while President of AHCA, and Chotkowski continued to demand that the Board refuse to fund requests from the Beef Marketing Committee, stating the work they were doing was a waste of time due to the existence of the QHB program.

199.   President McDowell-May and Chotkowski also repeatedly, and falsely, told the Board that the work the BMC was doing was redundant, despite there never having been produced beef marketing materials available to all AHCA members previously.

200.   Upon information and belief, President McDowell-May and Chotkowski were heard in private conversations insulting and using derogatory language towards Board members for supporting the work of the BMC.

201.   Despite these obstacles, in 2018, the BMC created and made available to all AHCA members professionally designed beef marketing materials.

202.   All photographs of Highland cattle, cuts of beef and recipes on the new beef marketing materials were donated for AHCA's use by Plaintiffs, as no other members offered to assist with these materials.

203.   Upon information and belief, Defendant AHCA's failure to hold Chotkowski accountable emboldened her to be more aggressive in her targeting of Plaintiffs and demonstrated that the Association would not prevent its members from using the Association to commit anti-competitive acts.

204.   Plaintiffs have been informed by former Board members and officers that they believe that, had the Board held Chotkowski accountable in 2015, the fraudulent 2018 anti-competitive actions against Plaintiffs discussed *infra* would not have occurred.

### 2018 False, Unfair and Fraudulent Anticompetitive Actions

205.   In 2018, following Plaintiffs' extremely successful year in 2017 showing their Highland cattle, the anticompetitive actions, attacks and harassment against Plaintiffs continued.

206.   On December 18, 2017, Josh Krenz emailed all members of the BMC that he had been appointed to Chair a newly convened AHCA Long Range Plan (LRP) Committee. The purpose of the Committee was to gather feedback on AHCA's most current long-range plan, developed in 2009.

207.   On January 3, 2018, Krenz emailed a copy of the then-current LRP to
all BMC members, including Plaintiffs, requesting feedback by January
15, 2018.

208.   In response to questions by members of the Facebook Highland Cattle
Breeders Group, which contained over 9000 members from forty-six
countries, seeking information about where AHCA policies might be
found, Plaintiff Steward posted AHCA documents. Plaintiff Steward
offered no opinion nor posed any questions about the AHCA documents.

209.   On May 23, 2018 Plaintiff Steward received an email from Defendant
AHCA's Operations Manager, Ginnah Moses, stating that "three
categories of complaints regarding your conduct were referred to the
Ethics Committee for consideration." One category referred to conduct in
the show ring, one to conduct in connection with a sale auction, and one
stating Plaintiff Steward had "willingly and intentionally published
outdated material with the intent to create discord and harm to the
association."

210.   Appended to the email from Ginnah Moses were copies of the Facebook
posting by Plaintiff Steward in January, 2018 containing portions of
AHCA's current LRP recently sent to her by LRP Committee Chair Krenz,
Bagpipe editor and then AHCA President Jacquelyn Chotkowski's 2010
President's Message and the AHCA's most current policy regarding

preparation of Highland breeding stock for presentation at AHCA point shows.

211.    In January, 2018, unbeknownst to Plaintiffs, AHCA President Laura McDowell-May falsely informed members of the Governance Committee, including the chair of the Ethics Committee, that she had received several letters, phone calls and texts complaining about Plaintiff Steward's post.

212.    The Governance Committee decided that it was not the duty of the Governance Committee to investigate the potential conduct of a member in social settings.

213.    The Governance Committee also noted that no issues were pending with the Ethics Committee at that time.

214.    At a subsequent Governance Committee meeting in March, 2018, the Committee was informed that, despite no vote being taken to conduct authorize such an action, investigations into two ethics issues were being undertaken.

215.    Despite attempted inquiry at that meeting, members of the Governance Committee who were not aware of the ethics investigations prior to the meeting were not provided any details.

216.    In violation of AHCA Rules and Regulations, and in contrast to the precedent set in 2015, the approval of the Board of Directors was not sought for such an investigation and, indeed, the Board was not informed that an investigation of Plaintiff Steward was being conducted.

217.  In addition to false reports of complaints regarding Plaintiff Steward's Facebook posts, the Ethics Committee also received false reports that Plaintiff Steward had conducted ethics violations by her conduct during a livestock show.

218.  The Ethics Committee purported to dismiss these allegations on the dual bases that it should not regulate the personal conduct of AHCA members and that the issue was prior to AHCA adopting the IAFE Code of Show Ring Ethics.

219.  However, it became clear that the allegations were actually dismissed because they were demonstrably false and fraudulent when made.

220.  Neither AHCA nor any other breed Association "adopts" IAFE Rules and Regulations and, additionally, as noted *supra*, AHCA point shows had been operating under IAFE Rules and Regulations for decades.

221.  Rather than inform the complainant that the accusations against Plaintiff were verifiably false and opened AHCA to liability, AHCA conspired to deceive Plaintiff and Association members by positing that some of the complaints could not be investigated because IAFE rules had not been adopted by the AHCA.

222.  AHCA then conspired to deceive Plaintiff and its members into believing AHCA had "decided to adopt" IAFE Rules and Regulations solely in order to justify its actions.

223.   At that time, Plaintiffs had not attended nor exhibited any of their cattle at an AHCA show since 2017.

224.   Upon information and belief, there were no irregularities or IAFE violations reported at the 2017 NWSS Highland Show, in any class, and specifically any class in which Plaintiff Steward was showing cattle.

225.   Upon information and belief, no one lodged any complaint about IAFE violations or any other complaint to the 2017 NWSS Show Superintendent about any actions by Plaintiffs showing Highland Cattle at the 2017 NWSS.

226.   Upon information and belief, there were no inappropriate occurrences by anyone, and specifically Plaintiff, during the 2017 NWSS Sale as stated by the Sale Auctioneer.

227.   Upon information and belief, at the conclusion of the May 15, 2018 Governance Committee meeting, it was the understanding of Governance Committee members that the unanimous decision was to inform the AHCA Board that there were no Ethics complaints that would be recommended to be addressed at this time.

228.   Notwithstanding this understanding, on May 23, 2018, Plaintiff Steward received notice from Defendant AHCA, through its employee Ginnah Moses, that Plaintiff Steward was being investigated for ethics complaints lodged against her.

229.   The Ethics Committee designated in the May 23, 2018 email from
       Moses consisted of Nick Self and Rick Martson.

230.   Upon receiving the May 23, 2018 notification of the Ethics Committee
       investigation, Plaintiffs wrote to the Ethics Committee and Board of
       Directors and requested copies of the complaints, the identity of the
       complainants and the show and sale to which the conduct complaints
       referred.

231.   Plaintiffs also notified the Ethics Committee and the Board of
       Directors that the accusations against them substantially impacted their
       businesses and livelihood.

232.   Plaintiffs also reminded the Ethics Committee that she had been
       falsely and unfairly targeted by AHCA officers and members before for
       fraudulent ethics violations and had been completely exonerated.

233.   Plaintiffs were informed by Board members that the Board was not
       aware of any complaints filed against Plaintiff Steward, had not
       authorized any Ethics investigation of Plaintiff Steward and had not
       convened an Ethics Committee to do so.

234.   On May 28, 2018, Plaintiff Steward again requested from the Board
       copies of the complaints so that Plaintiff could formulate her best response
       to them.

235.   On May 29, 2018, Plaintiff Steward received an email from AHCA
       President McDowell-May stating that "[m]atters before the Ethics

Committee are confidential and not referred the BOD except by the Ethics Committee when and IF they decide whether to even move a matter forward." (emphasis in original).

236. This statement is in direct violation of AHCA's Rules and Regulations as they existed at the time, which required Board approval before any Ethics investigation was conducted.

237. This protocol, required by AHCA's Rules and Regulations, was explicitly followed during the 2015 ethics investigation initiated by false and fraudulent statements by Chotkowski and AHCA officers.

238. Plaintiffs requested a hearing before the Board, as contemplated by the Rules and Regulations. On June 22, 2018, the Board, made aware for the first time of an investigation, but without the details of the complaints or investigation, voted to authorize the Ethics Committee to conduct the requested hearing.

239. One or more Governance Committee members who were present at the June 22, 2018 Board meeting were surprised by the announcement regarding an investigation as their understanding from an April Governance Committee meeting was that it had been decided that no ethics investigation was warranted.

240. At the June 22, 2018 meeting, when AHCA's then Vice-President requested to know who the complaint was filed against, he was informed that he could not have that information.

241.   The June 22, 2018 report of the Governance Committee to the AHCA
       Board confirmed that all Ethics complaints are required to be in writing
       and signed, either by letter or email.

242.   Prior to the hearing, Plaintiff Steward again requested on multiple
       occasions copies of the complaints and any and all relevant meeting and
       committee minutes where the issues were discussed.

243.   Plaintiffs' requests were routinely and repeatedly denied, in direct
       contravention of previous practice and stated policy.

244.   On August 21, 2018, Plaintiffs were informed that the complaints had
       been lodged directly with the Ethics Committee and that the Ethics
       Committee had independently made a determination to open an
       investigation.

245.   On August 29, 2018, Plaintiffs were informed that the Ethics
       Committee would provide them with no documents in response to their
       requests for minutes and copies of the complaints.

246.   A teleconference hearing with Plaintiffs in front of two Ethics
       Committee members was held on September 11, 2018, after which the
       Ethics Committee released a finding in which Plaintiffs were again
       exonerated.

247.   The findings were supposed to be kept confidential until shared with
       the Board.

248.   However, the findings appeared to have been shared with the complainant as, despite Plaintiffs' complete exoneration, the findings also stated that the complainant urged the committee to issue sanctions against the Plaintiff in the event of future Ethics complaints.

249.   The findings of the Ethics Committee were finally adopted by the Board, ending the second round of spurious charges against Plaintiffs, on January 24, 2019 after substantial delay.

250.   Upon information and belief, despite the fact that such charges against Plaintiffs were supposed to be confidential, AHCA officers, directors or committee members nonetheless released information through multiple methods that Plaintiffs had been charged with ethical violations, including those which were deemed frivolous or inappropriate to investigate.

251.   The complaints were totally fabricated with no basis in fact.

252.   The complaints were made, similar to the 2015 complaints, in order to harass, embarrass and abuse Plaintiffs in order to prevent them from taking part in AHCA point shows or attending AHCA events.

253.   Defendant's targeting and harassment of Plaintiffs for alleged Ethics violations was frivolous, capricious and designed to incur sanctions against or removal of Plaintiffs from the Association.

254.   Defendant's anticompetitive conduct, targeting and harassment of Plaintiffs was designed to, and did, cause pain and suffering and

humiliation for Plaintiffs and designed to, and did, encourage other AHCA members to sever personal and professional relationships with Plaintiffs.

255.   Defendant's conduct was further designed to, and did, cause other AHCA members to question if Plaintiffs were ethical breeders, and to decrease sales of Shat Acres breeding stock, reflected by a 30% drop in Plaintiffs' breeding sales in 2018, with not one animal sold to a member of the Association.

256.   Due to Defendant conduct, no AHCA member purchased any Shat Acres cattle in 2018 and 2019, dramatically decreasing Plaintiffs' potential economic return on its breeding stock.

257.   Defendant's anticompetitive behavior, targeting and harassment of Plaintiffs for demonstrably false Ethics violations was further designed to, and did, create an environment in which Plaintiffs could not bring their Champion Highland cattle to AHCA point shows.

Ongoing Harassment and Unfair/Anti-Competitive Actions

258.   The harassment and unlawful attempts to undermine Plaintiffs' business continues to the present.

259.   Upon information and belief, AHCA members have been falsely told that Plaintiffs are not ethical breeders, as they were being investigated for multiple Ethics violations and members were advised not to purchase Shat Acres animals for that reason.

260.   Upon information and belief, rather than exoneration, some members of the Board mistakenly believed that Plaintiff Steward was going to receive a "warning letter" in regards to the complaints alleged against her.

261.   Plaintiffs were asked in 2019 to make a presentation to Junior members of the Mid-Atlantic Highland Cattle Regional Association (MAHA) about showing cattle, due to Shat Acres' prestige of being the oldest registered herd of Highland cattle in the United States.

262.   When Plaintiff Steward contacted the organizer to confirm details, she was informed that their services were no longer needed, and that someone else would be making the presentation

263.   Plaintiff Steward subsequently learned that the organizer had been informed by the wife of an AHCA Officer and Governance Committee member that Plaintiff Steward was being investigated for multiple Ethics violations relating to shows and should not be allowed to make such presentations to Junior members.

264.   This is particularly troubling and humiliating to Plaintiff Steward, who prior to working full time on the farm, was an educator for thirty years, being named the 2002 Vermont Teacher of the Year and a 2004 American Star of Teaching.

265.   Plaintiff Steward continues to be active with the development of Vermont education standards and teaching graduate level education classes.

266.   The wife of the Board member who informed the organizer that Plaintiff Steward was under ethics investigations became the workshop presenter for the Juniors in her place.

267.   Upon information and belief, at a 2019 AHCA show, show officials shared false, and purportedly confidential, assertions that Plaintiffs were under investigation for misconduct at AHCA shows.

268.   Upon information and belief, AHCA officials have informed other AHCA members of their desire for Plaintiff and Shat Acres to stop showing their Highland cattle at AHCA point shows due to the quality of their cattle, their consistent winnings and their success with certain AHCA programs such as beef marketing.

269.   An AHCA member approached Plaintiff Shatney in a local farm supply store, berating Plaintiff Shatney and yelling loudly that she had been told by AHCA officials that Plaintiffs were troublemakers and liars and were causing problems for AHCA.

270.   AHCA officials and members have stated that former AHCA Presidents Chotkowski and McDowell May have been primary instigators in the targeting and harassing of Plaintiffs.

271.   As noted supra, Chotkowski was the Associate Editor for 14 years and has been the Editor and Publisher of the Bagpipe from 2017 to the present.

272.   Any submissions for the Bagpipe are to be sent to the Editor.

273.   Shat Acres Cinnamon Raisin was the most winning Highland cow in the United States with over a dozen Grand Championships and several Supreme Champions of Shows.

274.   Shat Acres Cinnamon Raisin had ten offspring, each offspring a Grand Champion, save her last calf that was never shown due to the targeting and harassment of Plaintiffs by the AHCA.

275.   In 2018 Shat Acres Cinnamon Raisin, at the comparatively young age of thirteen, developed arthritis in her hip.

276.   In the summer of 2018 Plaintiff Steward wrote and submitted an essay about the impending loss of Shat Acres Cinnamon Raisin, both for Plaintiffs and the Highland world.

277.   Plaintiff received an email from Chotkowski stating the Bagpipe did not publish stories about individual animals.

278.   Notwithstanding such a statement, the following issue of the Bagpipe contained a two page spread about an individual Highland bull, Finley Falls Duncan, owned by Robert Meyers.

279.   Finley Falls Duncan had won less Grand Championships than Shat Acres Cinnamon Raisin, and no Supreme Championships of Show.

280.   In 2018, Finley Falls Duncan had no registered offspring.

281.   Robert Meyers had previously purchased Highland cattle owned by Chotkowski.

AHCA's Investigations of Other Members and Protected Individuals

282.   In contrast to Defendant's actions toward Plaintiffs, complaints leveled against persons who were not viewed as a threat to certain AHCA members were treated vastly different.

283.   Upon information and belief, at the 2019 NWSS, AHCA President Josh Gregg was witnessed extremely intoxicated by Board and other members on the night of the banquet and had difficulty delivering his prepared remarks due to slurred speech.

284.   Upon information and belief, he was also witnessed by Board and other members supplying alcohol to minors in the bar area of the hotel and inappropriately behaving with Junior members in his hotel room following the banquet and into the early hours of the morning.

285.   Upon information and belief, there were several adult AHCA members present in the hotel room at times, including Chotkowski.  Some of the other adult AHCA members were also intoxicated.

286.   Upon information and belief, when Chotkowski entered Gregg's hotel room and witnessed the inappropriate behavior, she ordered the Junior members to leave the room.

287.   Upon information and belief, many AHCA members as well as Board members made complaints to the Ethics Committee regarding President Gregg's inappropriate actions.

288.   Members largely received no response to their complaints.  A sham and fraudulent investigation was documented while Board and other members

who had made the complaints were harassed, told it was none of their business and that they needed to apologize to Gregg because if what occurred "got out" it could cause problems for Gregg and his family.

289.   In a striking contrast, while Plaintiffs had been prohibited from ever receiving or reviewing a copy of the complaints allegedly made against them, Gregg was immediately provided a copy of a signed complaint made against him.

290.   Gregg then provided a response to the complaint after being allowed to review the complaint itself, including the identity of the complainant.

291.   Upon information and belief, additional complaints were made against Gregg, including one by a member of the Board of Directors, relating to his behavior in the hotel at the 2019 NWSS and forwarded to Gregg, with some including photographic and/or video evidence.

292.   Gregg was permitted to respond to the complaints in turn.

293.   Complainants were told that they needed to apologize to Gregg and threats that the complainants "needed to be dealt with" were made.

294.   The Ethics Committee conducted a cursory, sham investigation lasting merely a few weeks and submitted Gregg's responses to the Board of Directors without any reply gathered from the complainants or interviews performed of corroborating witnesses.

295.   In shocking contrast to the treatment of Plaintiffs, despite the serious allegations made against Gregg, the Ethics Committee issued a

recommendation that the allegations were unsubstantiated less than two months after the complaints were first made.

296. Even complaints made against non-members of AHCA are treated with significantly less rigor by Defendant when the individual alleged to have committed the violations is protected by influential members of the Association.

297. At the 2019 NWSS, Pearl Walthall, who has been employed to prepare cattle owned by Chotkowski, McDowell May and others, was observed and recorded repeatedly striking a Junior exhibitor's animal in the same class in which Walthall was showing an animal.

298. Multiple Ethics complaints were lodged regarding Walthall's abuse of a fellow breeder's animal by spectators present at the NWSS as well as those who witnessed the live broadcast throughout the United States and the world.

299. Some complainants received no response to their complaints.

300. Instead, the AHCA Show Committee justified the violation of the IAFE Rules by citing an unrelated document created by an unaffiliated entity regarding show etiquette.

301. Walthall's actions violated the show etiquette standards cited in the unrelated document as well.

302.   Defendant further informed some complainants that they must apologize to Walthall for complaining about her conduct and damaging her reputation.

303.   Upon information and belief, threats of legal action against AHCA were made if Walthall's conduct resulted in any ethics or conduct investigations.

304.   Upon information and belief, AHCA members and Defendant AHCA also intimidated and retaliated against the family of the Junior exhibitor whose animal was struck by Walthall.

### Impact on Plaintiffs of Defendant's Actions

305.   Defendant's targeting and harassment of Plaintiffs for alleged Ethics violations was frivolous, capricious and designed to incur sanctions against or removal of Plaintiffs from the AHCA.

306.   Defendant's actions were further designed to, and did, cause pain and suffering and humiliation for Plaintiffs as well as encourage other AHCA members to sever personal and professional relationships with Plaintiffs.

307.   Defendant's actions were further designed with the express purpose of causing other AHCA members to question the professionalism of Plaintiffs, to prevent Plaintiffs from attending and winning AHCA point shows, and to decrease sales of Shat Acres breeding products and stock. These results were achieved.

308.  Due to the actions of the Defendant and certain officers and members, Plaintiffs have been significantly and substantially damaged.

309.  The conspiracy perpetuated by certain members of AHCA, endorsed and perpetuated by AHCA itself through the false ethical investigations, had the intent of damaging Plaintiffs' business in an attempt to force them into compliance with those members' interests or to force them to cease to be members of AHCA.

310.  Due to the repeated false claims of ethical violations, Plaintiffs' standing and reputation, which had been built for decades, has been significantly tarnished. Plaintiffs have lost cattle sales due to other breeders believing, based on the false ethical claims, that Plaintiffs are unethical breeders.

311.  Plaintiffs have not attended livestock shows due to the harassment and humiliation brought about by AHCA and its officers and significant members.

312.  The inability of Plaintiffs to attend these shows has resulted in the inability to accumulate awards for their breeding stock and has also directly resulted in lost sales, which are often made at such shows.

313.  In addition, Plaintiffs have suffered severe emotional damages as a result of the continued campaign of harassment.

<u>Count I – Violations of the Sherman Antitrust Act</u>

314.    Plaintiffs reiterate and reassert all allegations contained in Paragraphs 1-313 above.

315.    Defendant's actions, and those of its officers and members, constitute a concerted action and/or conspiracy among two or more separate entities.

316.    The actions of Defendant, by and through its officers and members, are an unreasonable restraint on trade which affects interstate commerce.

317.    Plaintiffs' have been significantly damaged by Defendant's actions.

318.    Defendant's actions violate 15 U.S.C. § 1 and Plaintiffs' claims arise under 15 U.S.C. § 15 and 22.

<u>Count II – Violation of Vermont Consumer Protection Act</u>

319.    Plaintiffs reiterate and reassert all allegations contained in Paragraphs 1-318 above.

320.    Defendant's actions, and those of its officers and members, constitute an unfair or deceptive trade practice in commerce.

321.    Plaintiffs purchased a membership in reliance upon the stated purpose and mission of AHCA.

322.    Plaintiffs were damaged as a direct and proximate result of Defendant's actions.

323.    Defendant's actions violate 9 V.S.A. § 2453 and Plaintiffs' claims arise under 9 V.S.A. § 2461 and 2465.

<u>Count III – Breach of Covenant of Good Faith and Fair Dealing</u>

324.   Plaintiffs reiterate and reassert all allegations contained in Paragraphs 1-323 above.

325.   Plaintiffs' paid membership in AHCA and their reliance on the published Rules and Regulations and AHCA stated mission and purpose, created an implied covenant that AHCA would operate toward Plaintiffs in good faith.

326.   Defendant's actions and the actions of its members, officers and directors were unfair and unreasonable and were not made in good faith.

327.   Defendant's actions, and the actions of its members, officers and directors, reduced the value of Plaintiffs' membership and substantially reduced the value of Plaintiffs' livestock and business.

328.   Defendant's actions, and the actions of its members, officers and directors, directly violated the purpose of Plaintiffs' membership and violated the implied covenant of good faith and fair dealing.

329.   Plaintiffs were substantially damaged by as a direct result of Defendant's conduct.

<u>Count IV – Breach of Contract</u>

330.   Plaintiffs reiterate and reassert all allegations contained in Paragraphs 1-329 above.

331.   Plaintiffs entered into a contract for the purchase of a membership in AHCA, which was to provide them with representation of their interests and the promotion interests of the Highland cattle breed at large.

332.    Plaintiffs paid for their membership in AHCA but AHCA, through certain members and officers, sought instead to promote the interest of some members over Plaintiffs and devalue Plaintiffs' business.

333.    Plaintiffs were directly and proximately damaged by Defendant's actions.

WHEREFORE, Plaintiff prays that this Honorable Court:

a)  Take jurisdiction of this matter;

b)  Award compensatory damages to Plaintiffs for all damages caused by Defendants' actions, including pre-judgment and post-judgment interest;

c)  Award punitive and treble damages to Plaintiffs;

d)  Award to Plaintiffs all costs associated with this action, including filing fees, service fees and other costs awardable under Rule 54 of the Federal Rules of Civil Procedure;

e)  Award attorney's fees and such other relief as is just and equitable.

### **JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated this ___16th___ day of ___April___, 2020 at Montpelier, Vermont.

Respectfully Submitted,

Robin A. Freeman, Jr., Esq.
Earle & Freeman, PLC
P.O. Box 1385

107 State Street
Montpelier, VT 05601-1385
(802) 225-6495
raf@caroline-law.com

Attorney for Plaintiffs